**Slip Op. 13-78**

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| **TYCO FIRE PRODUCTS L.P.,** | |
| Plaintiff, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Court No. 08-00190** |
| Defendant. | |

**OPINION AND ORDER**

[Plaintiff's and Defendant's cross-motions for summary judgment are denied in Customs classification matter.]

Dated: June 21, 2013

Michael E. Roll, Pisani & Roll, of Los Angeles, CA, argued for the Plaintiff.

Amy M. Rubin, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of New York, NY, argued for the Defendant. With her on the brief were Stuart F. Delery, Acting Assistant Attorney General, and Barbara S. Williams, Attorney in Charge. Of counsel on the brief was Chi S. Choy, Office of Assistant Chief Counsel, International Trade Litigation, U.S. Customs and Border Protection.

Restani, Judge: Tyco Fire Products L.P. ("Tyco") appeals a U.S. Customs and

Border Protection ("Customs") ruling that Tyco's products — filled bulbs[1] it uses in fire

sprinklers and water heaters — are classified under Chapter 70 of the Harmonized Tariff

---

[1] The filled bulbs also are referred to as frangible glass bulbs, thermal bulbs, thermal triggers, and thermal activation devices, among other terms.

Schedule of the United States ("HTSUS"), as articles of glass.[2]  Tyco contends in its motion for

summary judgment that the goods should be classified within Chapter 84, as parts of certain

machines.  Tyco asserts that its goods are properly classified under Heading 8419 or 8424[3]

because the liquid compound inside the glass, not the glass itself, imparts the products with their

essential character.  Defendant United States asserts in its cross-motion for summary judgment

that Customs' determination was correct.  Alternatively, Defendant argues that Tyco has not

proven that the filled bulbs are principally or solely used in particular machines, and therefore the

court may not classify them as parts of such machines, at least not on summary judgment.

## BACKGROUND

This matter involves entries made through the Port of Dallas-Fort Worth, Texas,

from July 2004 until July 2006.  Case File Entry Docs, Dkt. No. 1.  Tyco was the importer of

record on the entries at issue.  See Pl.'s Statement of Material Facts Not in Dispute ("Pl.'s

Facts") ¶ 1; Def.'s Resp. to Pl.'s Statement of Material Facts as to Which There Are No Genuine

Issues to be Tried ("Def.'s Resp.") ¶ 1.  Each imported product consists of a sealed glass bulb

with an inner cavity that is filled with colored liquid.  See Pl.'s Facts ¶ 21; Def.'s Resp. ¶ 21.

The filled bulbs come in a variety of sizes in terms of length, diameter, and thickness.  Pl.'s Facts

¶¶ 61–63, 65–69; Def.'s Resp. ¶¶ 61–63, 65–69.  When a filled bulb is exposed to heat, the

---

[2] Tyco challenges Customs' classification decisions in two separate cases that have not been consolidated, Ct. Nos. 08-00190 and 08-00194.  The cases generally cover the same products, and therefore, this opinion addresses the claims in both cases for which the parties filed identical briefs.  An order is issued simultaneously in Ct. No. 08-00194 adopting the decision contained herein.

[3] All citations to the HTSUS refer to the HTSUS at the time of importation, i.e., the 2004–2006 versions.  There were no material changes to the relevant subheadings during this period of time.

temperature of the glass increases, and the heat is transferred through the glass to the liquid.  See

Pl.'s Facts ¶¶ 25–26; Def.'s Resp. ¶¶ 25–26.  As the liquid also heats, it expands in volume, and

a bubble that is present in the filled bulb's cavity shrinks.  Pl.'s Facts ¶ 27; Def.'s Resp. ¶ 27.

Eventually, the bubble disappears, and the bulb's cavity is completely filled with liquid.  Pl.'s

Facts ¶ 27; Def.'s Resp. ¶ 27.  Because the liquid no longer has space to expand within the

cavity, pressure on the glass builds.  Pl.'s Facts ¶ 27; Def.'s Resp. ¶ 27.  Over time, the pressure

increases to the point where the glass can no longer sustain the pressure on it, and the filled bulb

explodes or fractures.  Pl.'s Facts ¶ 27; Def.'s Resp. ¶ 27.  Based on this mechanism, all of the

filled bulbs at issue operate as thermal activation devices within some type of system.[4]  Pl.'s

Facts ¶ 14; Def.'s Resp. ¶ 14.

   In the case of a water-based fire sprinkler, the filled bulbs are mounted within the

metal sprinkler head such that they hold closed a valve, preventing water from spraying out of the

opening.  Pl.'s Facts ¶¶ 11–12; Def.'s Resp. ¶¶ 11–12.  When a certain temperature is reached,

the glass breaks, releasing the valve and allowing water to be dispersed.[5]  Pl.'s Facts ¶ 28; Def.'s

Resp. ¶ 28.  In the case of filled bulbs used in water heater systems, the filled bulbs are situated

within the device in a manner that holds open a door.  Pl.'s Facts ¶ 28; Def.'s Resp. ¶ 28.  The

---

[4] This case involves two general types of filled bulbs, as used by Tyco — those used in fire sprinkler systems and those used in water heater systems.  Pl.'s Facts ¶ 28; Def.'s Resp. ¶ 28.

[5] The filled bulbs are all designed to shatter at a predetermined temperature, determined by the amount of liquid placed in each bulb in comparison to the capacity of the cavity, i.e., the larger the bubble of air left in the cavity, the higher the activation temperature.  Pl.'s Facts ¶¶ 48–49; Def.'s Resp. ¶¶ 48–49.  Because the melting point for glass is quite high, Tyco's expert opined that without the liquid inside the bulb, the sprinkler system would likely melt before the empty glass bulb melted or exploded.  Dep. of Manual Silva ("Pl.'s Dep."), Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem."), Ex. A at 127–28, 183–84.

breaking of the glass allows the door within the system to close, cutting off the air supply to the

combustion chamber, thereby preventing an explosion.  Pl.'s Facts ¶ 28; Def.'s Resp. ¶ 28.

Thirty-nine models of the filled bulbs are used by Tyco in fire sprinkler systems.[6]  Pl.'s Facts ¶

10; Def.'s Resp. ¶ 10.  The other three models are used by Tyco exclusively as thermal release

devices for water heaters.  Pl.'s Facts ¶ 79; Def.'s Resp. ¶ 79.  According to Tyco's Rule 30(b)(6)

agent,[7] whether used in fire sprinkler systems or water heaters, the function of the filled bulb is

"[v]ery similar."  Pl.'s Dep. at 44.

        Tyco purchases its filled bulbs from two different German producers — Job

GmbH ("Job") and Geissler Glasinstrumente GmbH ("Geissler").  Pl.'s Facts ¶ 57; Def.'s Resp. ¶

57.  The same type of liquid, triethylene glycol, is used in all filled bulbs produced by Geissler.

See Pl.'s Facts ¶ 72; Def.'s Resp. ¶ 72.  Tyco, which is related to only Geissler, is unable to

identify the composition of the liquid in the Job filled bulbs at issue, but it believes that the liquid

component in at least some of Job's filled bulbs is triethylene glycol.  Pl.'s Facts ¶¶ 73–74.

        Tyco's entries were liquidated by Customs under subheading 7020.00.60, which

---

[6] Tyco's complaint in Ct. No. 08-00194 initially did not list HTSUS subheading 8419.90.10 as a possible classification.  Compl. ¶¶ 7–10, Dkt. No. 5, Ct. No. 08-00194.  Tyco, however, filed a motion to amend concurrent with its motion for summary judgment, and the court granted the amendment on February 9, 2012.  Ct. No. 08-00194, Dkt. No. 41.  Tyco now argues that the three models of filled bulbs used in water heater systems should be classified under HTSUS subheading 8419.90.10, and the remaining thirty-nine models of filled bulbs used in fire sprinkler systems should be classified under HTSUS subheading 8424.90.90.  Am. Compl. ¶¶ 1–17, Dkt. No. 35-1, Ct. No. 08-00194.  Alternatively Tyco argues that all forty-two models of filled bulbs should be classified under HTSUS subheading 8424.90.90.  Id. ¶¶ 18–20.  Both subheadings currently share the same tariff rate, free of duty.

[7] USCIT Rule 30(b)(6) permits designation by, inter alia, a private corporation of one or more "officers, directors, or managing agents" to testify on its behalf.  The designated individual must then "testify about information known or reasonably available to the organization."  USCIT R. 30(b)(6).

provides for "[o]ther articles of glass:[o]ther."[8]  Pl.'s Mem. 2; Case File Entry Docs, Dkt. No. 1.

Tyco claimed the filled bulbs were classifiable under subheading 8424.90.90, which provides for

"other" "parts" of goods of Heading 8424, free of duty.  Pl.'s Mem. 1–2.  Tyco filed a timely

protest and application for further review, challenging the classification of the merchandise at

issue.  See id.  In response, Customs' headquarters issued a ruling, HQ 5116 (Nov. 20, 2007),

available at, 2007 WL 4901407, confirming that the filled bulbs were properly classified in

Heading 7020 as articles of glass.  Id. at 2–3.  Customs based its position on statutory Note 1(c)

of Chapter 84 which excludes from Chapter 84 parts of machinery or appliances "of glass."  HQ

5116 at 2.  Tyco contends, however, that Note 1(c) does not apply to the filled bulbs at issue

because they are not articles "of glass."  Id. at 16.

## JURISDICTION AND STANDARD OF REVIEW

The court has jurisdiction in this case pursuant to 28 U.S.C. § 1581(a) (2006).

Although Customs' decisions ordinarily are entitled to a presumption of correctness pursuant to

28 § 2639(a)(1), the court makes its determinations based upon the record before it, not upon the

record developed by Customs.  See United States v. Mead Corp., 533 U.S. 218, 233 n.16 (2001).

Accordingly, the court makes findings of fact and conclusions of law de novo.  See 28 § 2640(a).

Summary judgment is appropriate when the parties' submissions "show[] that there is no genuine

---

[8] After the subject goods were entered, Tyco successfully lobbied Congress to amend the
tariff schedule to provide a new tariff line for its products, 9902.24.26: "Liquid-filled glass bulbs
designed for sprinkler systems and other release devices (provided for in subheading
7020.00.60)."  See Pub. L. No. 109-432, § 1331, 120 Stat. 3124 (2006); Mem. on Proposed
Tariff Legislation of the 109th Cong., Def.'s Ex. K.  This temporary subheading expired on
December 31, 2012 and has not been renewed.  See Pub. L. No. 111-227, § 3001(b)(10), 124
Stat. 2409, 2476 (2010) (extending the duty suspension through 2012 but modifying the rate to
0.9%).  The new tariff line is not retroactive, and therefore it does not govern the resolution of
the present case.

dispute as to any material fact and the movant is entitled to judgment as a matter of law." USCIT

R. 56(a). Where tariff classification is at issue, "summary judgment is appropriate when there is

no genuine dispute as to the underlying factual issue of exactly what the merchandise is."

Bausch & Lomb, Inc. v. United States, 148 F.3d 1363, 1365 (Fed. Cir. 1998).

       Plaintiff has the burden of establishing that the government's classification of the

product was incorrect, but it does not bear the burden of establishing the correct tariff

classification; instead, the correct tariff classification will be determined by the court. See Jarvis

Clark Co. v. United States, 733 F.2d 873, 878 (Fed. Cir. 1984). In determining the correct tariff

classification, the court first must "ascertain[] the proper meaning of specific terms in the tariff

provision." David W. Shenk & Co. v. United States, 960 F. Supp. 363, 365 (CIT 1997). That

meaning is a question of law. See Russell Stadelman & Co. v. United States, 242 F.3d 1044,

1048 (Fed. Cir. 2001). Second, the court must determine the tariff provision under which the

subject merchandise is properly classified based upon the factual description of the goods. See

Bausch & Lomb, 148 F.3d at 1365. This ultimate determination is also a question of law. Id. at

1365–66. The statutory presumption of correctness given Customs' classification decisions by

§ 2639(a)(1) does not apply if the court is presented solely with a question of law by a proper

motion for summary judgment. See Universal Elecs., Inc. v. United States, 112 F.3d 488, 492

(Fed. Cir. 1997).

### DISCUSSION

       The General Rules of Interpretation ("GRIs") and, if applicable, the Additional

U.S. Rules of Interpretation ("ARIs") of the HTSUS provide the analytical framework for the

court's classification of goods. N. Am. Processing Co. v. United States, 236 F.3d 695, 698 (Fed.

Cir. 2001).  For additional guidance as to the scope and meaning of tariff headings and notes, the

court also may consider the Explanatory Notes ("ENs") to the Harmonized Commodity

Description and Coding System, developed by the World Customs Organization.  Lynteq, Inc. v.

United States, 976 F.2d 693, 699 (Fed. Cir. 1992).  Although the ENs are not part of U.S. law

and therefore not binding on the court, they are "indicative of proper interpretation" of the tariff

schedule.  Id. (quoting H.R. Rep. No. 100-576, at 549 (1988) (Conf. Rep.), reprinted in, 1988

U.S.C.C.A.N. 1547, 1582) (internal quotation marks omitted).

GRI 1 instructs that tariff classification is to "be determined according to the

terms of the headings and any relative section or chapter notes."  The chapter and section notes of

the HTSUS are not interpretive rules; rather, they are statutory law, and therefore, they must be

considered in resolving classification disputes.  See Libas, Ltd. v. United States, 193 F.3d 1361,

1364 (Fed. Cir. 1999) (recognizing the controlling authority of chapter notes).  Goods that cannot

be classified solely by reference to GRI 1 must be classified by reference to the subsequent GRIs

in numerical order.  See N. Am. Processing, 236 F.3d at 698.  "The HTSUS is designed so that

most classification questions can be answered by GRI 1 . . . ."  Telebrands Corp. v. United States,

865 F. Supp. 2d 1277, 1280 (CIT 2012) (citing Edward D. Re, Bernard J. Babb & Susan M.

Koplin, 8 West's Fed. Forms, National Courts § 13343 (2d ed. 2012)).

A.      Competing Tariff Headings

Defendant has proffered Heading 7020 as the proper classification for Tyco's

filled bulbs.  Def.'s Mem. in Supp. of its Cross-Mot. for Summ. J. & in Opp'n to Pl.'s Mot. for

Summ. J. ("Def.'s Mem.") 8.  This basket heading for other articles of glass includes articles of

glass not classified elsewhere in the chapter or in the HTSUS.  The ENs to Chapter 70 confirm

this interpretation, explaining that articles containing glass are to be classified in Chapter 70

provided they are not more specifically covered by other headings of the HTSUS.  EN Ch. 70 at

1155 (2002).[9]  In turn, Heading 7020 is designed to cover glass articles not otherwise classified

in Chapter 70.[10]  EN Heading 7020 at 1178.  The ENs further explain that articles remain in

Heading 7020 "even if combined with materials other than glass, provided they retain the

essential character of glass articles."  Id.  Accordingly, if Tyco's filled bulbs retain the essential

character of glass and are not more specifically described elsewhere in the HTSUS, they are to be

classified in Heading 7020.

       The heading under which Tyco believes the goods are more specifically described

is Heading 8424,[11] as parts of sprinkler systems, or Heading 8419,[12] as parts of water heaters.

The goods prima facie appear to be described by each claimed heading in Chapter 84, at least

---

[9] All citations to the ENs are to the 2002 version, the most recently promulgated edition at the time of importation.

[10] Neither party contends that another part of Chapter 70 more specifically covers the goods, and the court has not found any other heading of the chapter that does so.

[11] Heading 8424 of HTSUS encompasses:
Mechanical appliances (whether or not hand operated) for projecting, dispersing or spraying liquids or powders; fire extinguishers, whether or not charged; spray guns and similar appliances; steam or sand blasting machines and similar jet projecting machines; parts thereof;

[12] Heading 8419 of the HTSUS covers:
Machinery, plant or laboratory equipment, whether or not electrically heated (excluding furnaces, ovens and other equipment of heading 8514) for the treatment of materials by a process involving a change of temperature such as heating, cooking, roasting, distilling, rectifying, sterilizing, pasteurizing, steaming, drying, evaporating, vaporizing, condensing or cooling, other than machinery or plant of a kind used for domestic purposes; instantaneous or storage water heaters, nonelectric; parts thereof;

based on Tyco's use of the goods.  Pursuant to GRI 1, however, the court must evaluate whether

the goods are excluded from Chapter 84 based on any relevant statutory notes.   As Defendant

points out, Note 1(c) to Chapter 84 excludes "[l]aboratory glassware (heading 7017); machinery,

appliances or other articles for technical uses or parts thereof, of glass (heading 7019 or 7020)."[13]

   The exclusionary note is further described by the EN to Chapter 84.  The EN

explains that Note 1(c) is intended to exclude an article if "it has the character of an article . . . of

glass."  EN Ch. 84 at 1393.  Furthermore, the ENs provide an illustrative list of articles "of glass"

that incorporate a component of minor importance, such as "stoppers, joints, taps, etc., clamping

or tightening bands or collars or other fixing or supporting devices (stands, tripods, etc.)."  Id.

On the other hand, an article loses its character as being "of glass" when it is combined with a

high proportion of other materials or the glass acts as a static component of an article that

incorporates a dynamic component, such as a motor.  See id.

---

[13] Defendant argues that the court's analysis may end here based on GRI 2(b).  Def.'s
Reply to Pl.'s Resp. to Def.'s Cross-Mot. for Summ. J. ("Def.'s Reply") 1.  That GRI explains:
> Any reference in a heading to a material or substance shall be taken to include a
> reference to mixtures or combinations of that material or substance with other
> materials or substances.  Any reference to goods of a given material or substance
> shall be taken to include a reference to goods consisting wholly or partly of such
> material or substance.

The GRIs are applicable to headings and, by virtue of GRI 6, subheadings, but not to statutory
notes.  See Ciba-Geigy Corp. v. United States, 223 F.3d 1367, 1372–73 (Fed. Cir. 2000)
(explaining that before the court may resort to GRI 3, the good must be classifiable within at least
two competing headings, in light of the chapter notes).  Even assuming GRI 2(b) was applicable
here, Defendant fails to appreciate the final sentence of GRI 2(b): "The classification of goods
consisting of more than one material or substance shall be according to principles of rule 3."
This in turn directs the court to apply the heading that most specifically describes the good, and
where the classification is still uncertain as between two headings or subheadings, to classify the
goods according to their essential character.  GRI 3(a), (b).  Therefore, even applying
Defendant's flawed interpretative methodology, the court's analysis would not end without an
examination of the essential character of the goods.

Accordingly, an analysis under either EN directs the court to undertake an essential character test. If the filled bulbs retain the essential character of glass, they must be classified under Heading 7020. If they are not articles "of glass," they may be classifiable in Chapter 84.[14]

B.      Essential Character

In evaluating essential character in the analogous context of GRI 3(b), courts often consider a variety of factors, including those laid out in the relevant EN to that GRI:

> The factor which determines essential character will vary as between different kinds of goods. It may, for example, be determined by the nature of the material or component, its bulk, quantity, weight or value,[15] or by the role of a constituent material in relation to the use of the goods.

EN GRI 3(b), (VIII) (footnote added). Importantly, while this list of factors is instructive, it is not exhaustive. See Home Depot, U.S.A., Inc. v. United States, 427 F. Supp. 2d 1278, 1293 (CIT 2006), aff'd, 491 F.3d 1334 (Fed. Cir. 2007). A court may further consider the article's name, other recognized names, invoice and catalogue descriptions, size, primary function, uses, and ordinary common sense. Id. at 1293. In applying this test in Pillowtex, the Federal Circuit affirmed the CIT's decision that a comforter shell made of cotton and stuffed with down filling

---

[14] Another potential classification of the filled bulbs could be under the appropriate heading for the liquid component. Neither party has addressed this possibility in its briefs, and the content of the liquid in at least some of the filled bulbs remains unknown. Because the court denies both cross-motions for summary judgment, the lack of evidence on the contents of the filled bulbs is not important at this stage.

[15] The parties appear to be unaware of the relative weights or values of the glass and liquid components of the filled bulbs. See Pl.'s Mem. 19 n.7. Tyco's expert provided information on the cost of each part of the filled bulb in a per kilogram format. Decl. of Manuel Silva, Pl.'s Mem. Ex. C at 2. Without specific weight information, however, the court effectively is unable to use this data in considering these factors. Defendant also decided not to conduct its own analysis of the filled bulbs to permit the court to consider these factors.

derived its essential character from the down filling, which provided an insulating quality and

made the product useful as a bed covering.  Pillowtex Corp. v. United States, 171 F.3d 1370,

1376 (Fed. Cir. 1999).  Similarly, the court looked to function in Better Home in which it

decided that a plastic lining imparted a shower curtain with its essential character based on its

function.  Better Home Plastics Corp. v. United States, 119 F.3d 969, 970–71 (Fed. Cir. 1997).

Relying on this line of cases deciding essential character primarily based on the

article's function, the parties contest the relative importance of the glass and the liquid

components of the filled bulbs with respect to the product's function.  They largely agree that this

should be the key factor in deciding the filled bulbs' essential character.  Compare Pl.'s Facts ¶¶

33–37, with Def.'s Resp. ¶¶ 33–37.  Tyco asserts that the liquid aspect of the device is "more

influential" than the glass component because it is the liquid's response to heat that causes the

glass to shatter.  Pl.'s Facts ¶¶ 33, 35 (describing the fluid as the "'brains' behind the operation of

a bulb").  Tyco argues that the specific type and amount of fluid used influences when and how

quickly the filled bulb responds, and it ensures that the filled bulb can perform adequately over

the life of the machine.  Id. at ¶¶ 30–31.  The glass, Tyco maintains, does nothing other than "just

'sit[] there'" and heat up.  Id. at ¶ 36.  By contrast, Defendant asserts that the glass is "critical

because there is no bulb without it."  Def.'s Resp. ¶ 36.  Furthermore, Defendant argues that the

glass component alone is responsible for the devices' load factor.  Def.'s Mem. 4 (citing Pl.'s

Dep. at 71).  Defendant also asserts that the glass component is "working" constantly, from the

moment the filled bulb is installed into a release device until the moment the device is triggered,

which is a brief moment that ideally never comes to pass.  Id.

There are various considerations consumers take into account when selecting a

filled bulb for a particular application: the reaction time it takes the device to reach the

temperature at which the filled bulb will shatter, the load to which the device will be subjected,

the environmental conditions in which it is used, and the temperature at which the glass will

shatter.  Pl.'s Facts ¶ 92; Def.'s Resp. ¶ 92.  With the exception of load factor, both the glass and

liquid components of the filled bulb play some role in determining each characteristic, albeit to

varying degrees.  Pl.'s Facts ¶¶ 78, 92; Def.'s Resp. ¶¶ 78, 92.

       The court concludes that based on the evidence put forward by both parties in

their cross-motions for summary judgment, questions of material fact exist that preclude

summary judgment in favor of either party at this juncture.  The parties have focused extensively

on the relative functional importance of the glass and liquid components of the filled bulbs.  As it

stands, the court recognizes that obviously both components play a critical role in the function of

the device.  The filled bulbs would not function properly as commercial products without some

shattering mechanism, such as the expandable liquid inside of them.  They are not simply glass

stoppers that happen to be filled with liquid.  On the other hand, it is the presence of the glass

component of the filled bulb within a machine that holds a valve closed or a door open.  In turn,

the sudden absence of the filled bulb in the event of a fire allows the sprinkler to operate.  No

evidence has been put forward regarding other important factors that courts have considered

when deciding essential character, such as the weight and value of the components.  This

evidence is particularly important where, as here, the question of the relative importance of each

component to the product's function is far from clear.  Because of this factual uncertainty,

summary judgment is inappropriate.

      C.      <u>Sole or Principal Use</u>

Another dispute of material fact exists as to the filled bulbs' sole or principal use,

also precluding summary judgment.  Tyco alleges that it uses all but three models of filled bulbs

solely in fire sprinkler systems, classified under Heading 8424.  Pl.'s Facts ¶¶ 10, 79.  It also

claims that the other three models of filled bulbs are used solely in water heaters, classified under

8419.  Pl.'s Facts ¶¶ 10, 79.  Defendant does not dispute these statements of fact with respect to

Tyco's use.  Def.'s Resp. ¶¶ 10, 79.  Defendant claims, however, that Tyco has not put forward

evidence that these are the sole or principal uses of the filled bulbs in the overall U.S. market.

Def.'s Mem. 26–27.  Defendant also has put forward evidence of several other uses of filled

bulbs, both from Job and another U.S. company, Kidde Fire Systems.  <u>See</u> Def.'s Ex. H, N, O, P,

Q (showing uses of the filled bulbs in kitchen hoods and fire doors, among others); Pl.'s Dep. at

46 (identifying other possible uses to include door and ventilation links).

Under ARI 1(c), to be classified as a part of a particular device, the article must be

principally or solely used as a part in that device, and it "must not have substantial other

independent commercial uses."  <u>Baxter Healthcare Corp. v. United States</u>, 182 F.3d 1333,

1338–39 (Fed. Cir. 1999) (citing <u>Bauerhin Techs. Ltd. P'ship v. United States</u>, 110 F.3d 774, 779

(Fed. Cir. 1997)).  Because ARI 1(c) renders all parts subheadings use provisions, the court must

also apply ARI 1(a):

> [A] tariff classification controlled by use (other than actual use) is to be
> determined in accordance with the use in the United States at, or immediately
> prior to, the date of importation, of goods of that class or kind to which the
> imported goods belong, and the controlling use is the principal use.

Principal use has been defined as "the use 'which exceeds any other <u>single</u> use.'"  <u>Aromont USA,</u>

Inc. v. United States, 671 F.3d 1310, 1312 (Fed. Cir. 2012) (emphasis in original) (quoting

Conversion of the Tariff Schedules of the United States Annotated into the Nomenclature

Structure of the Harmonized System: Submitting Report 34-35 (USITC Pub. No. 1400) (June

1983)).  "The principal use of the class or kind of goods to which an import belongs is

controlling, not the principal use of the specific import."  E.M. Chems. v. United States, 923 F.

Supp. 202, 208 (CIT 1996).  In considering whether a product falls within a particular class or

kind of goods, courts have considered a variety of factors including:

> (1) the general physical characteristics of the merchandise; (2) the expectation of
> the ultimate purchasers; (3) the channels of trade in which the merchandise
> moves; (4) the environment of the sale (e.g. the manner in which the merchandise
> is advertised and displayed); (5) the usage of the merchandise; (6) the economic
> practicality of so using the import; and (7) the recognition in the trade of this use.

Id. (citing United States v. Carborundum Co., 536 F.2d 373, 377 (C.C.P.A. 1976)).

        Accordingly, the first question before the court is whether all forty-two bulbs are

part of a single class or kind of goods.  Tyco has submitted uncontradicted evidence that its water

heater bulbs were designed for use specifically in water heaters.  These filled bulbs have a

distinct shape and size and were made for a particular customer.  There is no evidence on the

record that indicates these goods are interchangeable with the other filled bulbs and appear to be

directly sold only for use in particular water heaters.  Accordingly, these filled bulbs appear to be

a separate class or kind of filled bulb from the other thirty-nine models at issue.  No evidence has

been submitted by Defendant demonstrating alternative uses for this particular class of filled

bulbs, and therefore, Tyco has met its burden in demonstrating the principal use of these filled

bulbs as parts of water heaters.[16]

Turning to the other thirty-nine bulbs at issue, the court finds that a genuine dispute of a material fact exists regarding the principal use of this class of bulbs. The parties have submitted conflicting evidence on use, rendering summary judgment inappropriate as to this issue as well. Tyco's patent and marketing materials, while not conclusive, provide some evidence to support its claim that the use "which exceeds any other single use" is fire sprinklers. Defendant's marketing and patent evidence, while far from conclusive, however, demonstrates that the manufacturer of some of the filled bulbs, Job, advertises the filled bulbs for other commercial uses. Additionally, the Kidde literature demonstrates that the same mechanisms advertised by Job are made and/or sold in the United States, incorporating similar bulbs.[17] Taken together this is sufficient to at least call into question the principal use of the class of bulbs in the U.S. at the time of importation. All that the evidence has shown conclusively at this point is that the bulbs serve no commercial purpose without being incorporated into some type of device. It does not demonstrate as a matter of law the principal use of the goods.

The court notes that the question of principal use is material not just to determine whether the filled bulbs are excluded from Chapter 84 but also to decide where in Chapter 84 the filled bulbs could be classified. For example, the filled bulbs may be classified under different

---

[16] The government also argues that the filled bulbs may not be considered parts because they function as thermal triggers even when not installed within a machine. Def.'s Mem. 25–26. This function, however, serves no commercial purpose if the filled bulb is not installed within some type of trigger mechanism.

[17] The Kidde marketing material does not describe the exact types of filled bulbs used within the company's systems. The drawings, however, appear similar to the devices displayed in Job's advertising, and the bulbs appear similar in design. Compare Def.'s Mem. Ex. H with Def.'s Mem. Exs. O, P.

headings as parts of particular machines or as parts of goods classified in basket subheading 8485.90[18] if they may be used interchangeably in multiple machines.  See HTSUS, Section XVI, Note 2.  As demonstrated, in part, by Tyco's alternative argument that all filled bulbs should be classifiable as parts under Heading 8424, the record does not settle fully the question of whether the filled bulbs were used in a variety of settings.

Although Tyco has not produced sufficient, undisputed evidence to demonstrate that it is entitled to judgment as a matter of law at this juncture, the government also has not put forward sufficient evidence to show that undisputed facts require classification under Customs' selected heading.  Although summary judgment is often an important, frequently-used tool in classification cases, failure of either party to succeed on its summary judgment does not automatically result in summary judgment for the other party, even in light of the statutory burden placed on Tyco.  Where factual disputes persist, a trial may be needed to permit the court to find the requisite facts in order to make the legal determination of selecting the appropriate tariff provision.

[18] As of 2007, this subheading was renumbered as 8487.90.

## CONCLUSION

For the foregoing reasons, the court denies both Plaintiff's and Defendant's cross-motions for summary judgment.  The parties are to file a new scheduling order within 30 days of this opinion.

                                                        /s/ Jane A. Restani
                                                          Jane A. Restani
                                                               Judge

Dated: June 21, 2013
       New York, New York